UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------X

UNITED STATES OF AMERICA,

    - against -

                        **<u>MEMORANDUM & ORDER</u>**

CARLOS TORRES RAMIREZ, also known as
"Luis F. Rosa Villanueva" and "Luis        09-CR-641 (KAM)
Felipe Rosa Villanueva,"

              Defendant.
-------------------------------------X

MATSUMOTO, United States District Judge:

       Defendant Carlos Torres Ramirez ("defendant" or

"Torres Ramirez") is charged with use of a passport secured by

false statements (Count One), misuse of a passport (Count Two)

and aggravated identity theft (Count 3), in violation of 18

U.S.C. §§ 1542, 1544, 1028A, respectively.  (Doc. No. 6,

Indictment.)  Defendant moves to suppress statements he made on

August 17-18, 2009 to United States Customs and Border

Protection ("CBP") officers following his arrival at John F.

Kennedy International Airport ("JFK").

       The court held a suppression hearing on December 2,

2009 at which the government presented two witnesses: CBP

Officer David Hernandez ("Officer Hernandez") and CBP

Enforcement Officer Daniel Teitelbaum ("Officer Teitelbaum").

(*See generally* Transcript of Suppression Hearing ("Tr.").)

       Having considered the appropriate burdens of

production and proof, the testimony of witnesses, the

suppression hearing exhibits, the parties' written submissions, including defendant's declaration dated November 4, 2009 (doc. no. 11), and having resolved issues of credibility, the court grants in part and denies in part defendant's motion. What follows sets forth the findings of fact and conclusions of law upon which this determination is based.

## FINDINGS OF FACT

Defendant arrived at Terminal 4 at JFK on August 17, 2009 at 8:46 p.m. on a flight from Santo Domingo, Dominican Republic. (Tr. at 11-13; Gov. Ex. 1, Daily Passenger Inspection Log.) Upon his arrival at the primary passport inspection area, defendant presented to customs officials a United States passport, birth certificate and a United States customs declaration in the name of Luis Rosa Villanueva. (Tr. at 15-16; *see* Gov. Ex. 3, Passport; Gov. Ex. 4, Birth Certificate; Gov. Ex. 5, Customs Declaration.) Defendant was then referred for a secondary inspection at approximately 9:24 p.m. (Tr. at 15-16; Gov. Ex. 2, Flight Manifest.) According to Officer Hernandez, a secondary inspection was conducted to determine defendant's "admissibility" into the United States. (Tr. at 5, 17-18.)

### A. Officer Hernandez

Officer Hernandez, whose testimony the court finds credible, testified that he has been employed by CBP for approximately two years, during which time he has worked in the

passenger processing unit at JFK. (*Id.* at 3-4.) In August
2009, Officer Hernandez was assigned to perform secondary
inspections. (*Id.* at 6.)

According to Officer Hernandez, a secondary inspection
is conducted to "further review" a passenger's "admissibility"
into the United States, with databases, after a CBP officer
conducting a primary inspection finds that more in-depth
admissibility inquiries are required. (*Id.* at 5-6, 14-15.)
Passengers may be denied admission to the United States when
they "do not have the correct entry documents, prior overstays,
[or] false claims to United States citizenship." (*Id.* at 5-6.)
Officer Hernandez testified that verification of a passenger's
identity involves review of that person's travel documents, such
as passports, visas and customs declarations to ensure
authenticity. (*Id.* at 7, 17.) Computer database queries are
also employed to search for, among other things, criminal
history and arrest records associated with the passenger. (*Id.*
at 17-18.) Officer Hernandez testified that as of August 2009,
he had conducted "hundreds" of secondary inspections. (*Id.* at
9.)

Officer Hernandez testified that he has never received
any training on criminal law at "CBP or elsewhere[.]" (*See id.*
at 5.) Nor has Hernandez recommended anyone for criminal
prosecution or referred any passenger to the CBP's Criminal

Enforcement Unit ("CEU"). (*Id.* at 9.) It is not "part of" Hernandez's job to "refer cases" to the CEU. (*Id.*) Instead, Officer Hernandez testified that following a secondary inspection, he reports his findings to his supervisor who, in turn, decides whether to admit the passenger into the United States. (*See id.* at 8.) If the supervisor decides not to admit the passenger, it would be "considered an adverse action" and the passenger "would be returned to their country." (*Id.*) Officer Hernandez would first be required to take a "sworn statement" to maintain a "record" regarding the passenger's "alienage" and "inadmissibility." (*Id.* at 8.) As of August 2009, Officer Hernandez had taken "[b]etween 40 and 50" sworn statements. (*Id.* at 9.) Based on his experience, Hernandez is aware that a false claim to United States citizenship may result in criminal prosecution even though he does not make the decision to refer cases to the CEU. (*Id.* at 9-10, 48.)

Between 9:30 p.m. and 10:00 p.m. on August 17, 2009, Officer Hernandez received defendant's passport, birth certificate and customs declaration and interviewed defendant, who first presented to Hernandez by the name on defendant's passport, "Luis F. Rosa Villanueva." (*Id.* at 11-17.) The first phase of the secondary inspection was conducted in Spanish, which Hernandez speaks fluently, in a "large room" with benches which were positioned across from a desk with a computer. (*Id.*

at 19.)  Other CBP officers and passengers were also present in the room.  (*Id.* at 19-20.)

Following a review of defendant's identification documents for authenticity (Tr. at 17; *see* Gov Exs. 3-5), Officer Hernandez searched a computer database for criminal history associated with defendant's purported identity, pursuant to standard procedures.  (Tr. at 17-18.)  The criminal history search revealed that the name Luis F. Rosa Villanueva matched two identities with arrest records, including a 2005 arrest for an immigration offense of "entry without inspection." (*See id.* at 18, 20; Gov. Ex. 9 at CTR 100; Gov. Ex. 10 at CTR 98.)  At approximately 10:00 p.m., after learning of the criminal history, Officer Hernandez asked defendant if he had ever been arrested.  (*Id.* at 18.)  Defendant answered "no."  (*Id.*)

Based on inconsistencies between defendant's statement and data from the criminal history for his purported identity, Officer Hernandez suspected that defendant might be an "imposter[.]"  (*See id.* at 20.)  Accordingly, Officer Hernandez took defendant's fingerprints, ran them through an FBI database, and discovered that they matched the immigration violation in 2005 about which Hernandez had asked defendant.  (*Id.*)  Officer Hernandez then advised defendant of this finding.  Between 10:30 p.m. and 11:00 p.m., defendant admitted that he had been arrested in 2005 and his real name was Carlos Torres, and

advised Hernandez of his country of birth.  (*Id.* at 20-21.)

Officer Hernandez testified that once defendant's fingerprints

matched the previous immigration violation, and it was

determined that defendant was not the "true bearer of the

documents he presented[,]" defendant was not free to leave,

withdraw his application for entry into the United States or

return to the Dominican Republic.  (*Id.* at 39-40.)

Officer Hernandez then advised his supervisor of

defendant's statements.  (*Id.* at 21.)  At approximately 11:00

p.m., the supervisor directed Officer Hernandez to complete a

"adverse action" or "expedited removal," that is, "to remove

someone from the country as soon as possible[,]" and to take

defendant's sworn statement, a standard practice for any adverse

action including a removal.  (*Id.* at 21-23.)  The supervisor

instructed Hernandez "not to ask any questions regarding the

passport" or how he obtained it" because "the entire case would

be reviewed in the morning by the Criminal Enforcement Unit."

(*Id.* at 21.)  Officer Hernandez did not know of any CEU

personnel working at that time on that day at JFK.  (*Id.* at 22.)

Although Officer Hernandez's supervisor did not indicate whether

defendant would be criminally prosecuted (*id.* at 22), Officer

Hernandez testified that he understood defendant could "possibly

be prosecuted" for falsely claiming United States citizenship

(*see id.* at 48).  Of the 40 to 50 secondary inspections that

Officer Hernandez conducted that night, defendant was the only passenger whom Hernandez's supervisor advised would be referred to the CEU.  (*Id.* at 47.)

Officer Hernandez prepared to take defendant's sworn statement by typing a series of questions regarding defendant's "alienage" and "admissibility" into a form.  (*Id.* at 22.) Officer Hernandez explained that although defendant's fingerprints matched the fingerprints of a previously arrested and deported alien, a sworn statement was necessary to ensure that defendant was indeed removable and did not have a claim to citizenship based on alienage.  (*See id.* at 24-25.)

Officer Hernandez then asked defendant to enter an office, described as a "small room about 12 feet by 12 feet" with several chairs, a desk and computer.  (*Id.* at 23.) Hernandez and another CBP officer who served as a witness sat across the desk from defendant.  (*Id.*)  Defendant was not restrained in any way.  (*Id.* at 25.)

Before taking defendant's sworn statement, Officer Hernandez advised defendant, in Spanish, of certain "rights . . . and the purpose and consequences of th[e] interview."  (Gov. Ex. 7, Record of Sworn Statement; *see* Tr. at 26-27, 50.)  Even though Officer Hernandez's supervisor had directed him to complete an "expedited removal" and take "adverse action"

against defendant, Officer Hernandez advised defendant, *inter alia*, that

> You do not appear to be admissible or to have the
> required legal papers authorizing your admission
> to the United States.  This may result in your
> being denied admission and immediately returned
> to your home country without a hearing . . . .
>
> This may be your only opportunity to present
> information to me . . . to make a decision . . . .
>
> If you lie or give misinformation, you may be
> subject to criminal or civil penalties, or barred
> from receiving immigration benefits or relief now
> or in the future. . . .
>
> Until a decision is reached in your case, you
> will remain in the custody of the Immigration and
> Naturalization Service.

(Gov. Ex. 7.)  Defendant indicated that he understood the above advisory, had no questions, and was willing to answer Officer Hernandez's questions.  (*Id.* at CTR 51.)

Officer Hernandez took defendant's sworn statement between midnight and 2:00 a.m. on August 18, 2009.  (*Id.* at 24, 28.)  During the second phase of questioning and in his sworn statement, defendant admitted, *inter alia*, that (i) his true name is Carlos Torres; (ii) he was born in the Dominican Republic in 1965; (iii) his parents are Dominican citizens; (iv) he has no claims to United States citizenship or residency; (v) he has no pending petitions with the United States Citizenship and Immigration Service; (vi) he is not married and has no children; and (vii) he has no immediate family members who have

pending claims to United States citizenship or residency. (Gov.
Ex. 7 at CTR 52.) At the point midway through the questioning
on page 2 of Government's Exhibit 7, when Officer Hernandez had
obtained a match on defendant's fingerprints and defendant's
admission that he was not the person named in the passport he
presented, that he and his parents were citizens of the
Dominican Republic and that he had no claims to United States
residency or citizenship, Officer Hernandez confirmed that
defendant was excludable, as previously determined by his
supervisor. (*Id.* at 41.)

Officer Hernandez asked defendant whether he presented
to CBP officers a United States passport and birth certificate
bearing the name of Luis F. Rosa Villanueva, to which defendant
responded "yes." (*Id.* at CTR 53.) Defendant was also asked
whether the passport had previously been used to depart the
United States on August 1, 2009, to which defendant responded
"Yes, that was me." (*Id.*) Officer Hernandez then asked
defendant about the circumstances of a 2005 immigration
"problem" and a 2006 arrest. (*Id.*) Defendant was also asked
where and how long he had resided in the United States and
whether he had been employed in the United States. (*Id.* at CTR
53-54; *see* Tr. at 52.) Officer Hernandez testified that he had
asked defendant about his address to "validat[e] the address"

defendant had written on his customs declaration form. (Tr. at 52.)

Officer Hernandez also asked defendant a series of questions to determine whether he had an asylum claim. (*Id.* at 29-30; *see* Gov. Ex. 8.) Defendant advised Hernandez that he had no fear or concern about being returned to his home country or being removed from the United States. (Gov. Ex. 8.) He also stated that he would not be harmed if he returned to his home country. (*Id.*)

After taking defendant's sworn statement, Officer Hernandez asked defendant to return to the public secondary area, whereupon Hernandez showed his supervisor defendant's statement. (Tr. at 31.) At approximately 1:00 a.m., Officer Hernandez's supervisor instructed Hernandez to complete the paperwork required for expedited removal. (*Id.*) At approximately 2:00 a.m., Hernandez began to prepare the required paperwork and a narrative summary of his investigation. (*See* Gov. Ex. 9; Tr. at 31-32.) Officer Hernandez completed the paperwork at approximately 5:30 a.m. and presented it to his supervisor. (Tr. at 35, 37-38; *see* Gov. Ex. 12.) Officer Hernandez left his shift and went home between 5:45 a.m. and 6:00 a.m. (Tr. at 38.)

Officer Hernandez's supervisor specifically advised him that defendant's case would be reviewed for prosecution by

the CEU.  (*Id.* at 46.)  Based on his experience, Officer Hernandez knew that cases involving false claims to United States citizenship and reentry after deportation would be sent for review by the CEU.  (*Id.* at 47-48.)  Officer Hernandez was also aware that the CEU would review the immigration documents presented by the defendant, the computer database printouts and the statements that Officer Hernandez obtained from defendant. (*Id.* at 48-49.)

**B. Officer Teitelbaum**

Officer Teitelbaum, whose testimony the court finds credible, testified that he has worked for CBP and its predecessor agency, the Immigration and Naturalization Service ("INS"), for eleven years.  (*Id.* at 59-60.)  In August 2009, Office Teitelbaum worked as a CBP officer assigned to the CEU, which investigates arriving international passengers that have criminal liability that extends beyond standard questions of admissibility.  (*Id.* at 60-61.)  Officer Teitelbaum has received training on the law of passport misuse, aggravated identity theft, and *Miranda* warnings.  (*Id.* at 62.)

Officer Teitelbaum began his shift in the CEU at approximately 6:00 a.m. on August 18, 2009, although he first worked an overtime shift in the primary inspection area from 5:00 a.m. to 6:00 a.m.  (*Id.* at 71.)  Officer Teitelbaum and his supervisor were the first members of the CEU to arrive for work

on August 18, 2009.  (*Id.* at 71.)  At approximately 6:15 a.m.,

Officer Teitelbaum's supervisor advised him of a passenger "that

appears to meet the criteria" for criminal prosecution.  (*See*

*id.* at 72.)  After speaking with his supervisor, Officer

Teitelbaum reviewed defendant's file, including Officer

Hernandez's notes, conducted computer queries to "gather

information" about defendant and obtained a Spanish interpreter.

(*Id.* at 72-73, 96.)

Officer Teitelbaum's interview of defendant began at

approximately 7:10 a.m.  (*Id.* at 74; *see* Gov. Ex. 3500-DT-2,

Handwritten Notes.)  To initiate the interview, Officer

Teitelbaum advised defendant that he was a member of the CEU and

that this interview would focus on possible criminal

prosecution, as opposed to administrative violations.  (*See* Tr.

at 74-75.)  At approximately 7:18 a.m., Officer Teitelbaum read

defendant *Miranda* warnings and provided to defendant a Spanish

language *Miranda* waiver form.  (*See* Gov. Ex. 17, Waiver Form;

Tr. at 75.)  Defendant indicated that he understood his rights,

and signed the waiver form at approximately 7:22 a.m.  (Gov. Ex.

17; Tr. at 76.)  According to Officer Teitelbaum, defendant was

considered under arrest "when we read him the *Miranda* rights."

(Tr. at 93.)

Officer Teitelbaum began questioning defendant at 7:23

a.m.  (*Id.* at 78; Gov. Ex. 3500-DT-2.)  Defendant admitted that

his name is Carlos Torrez Ramirez, born in 1975, in Santo Domingo, Dominican Republic. (Gov. Ex. 3500-DT-2 at CTR 90.) Defendant further admitted that he is not Luis Rosa Villanueva and that the photo in the passport depicts defendant. (*Id.*) Defendant also admitted that he purchased a birth certificate and social security card in 2001 from a man in Puerto Rico, he believed the documents were real and that the seller was the true owner of the documents. (*Id.* at CTR 90-91; Tr. at 79.) Defendant also stated that with those documents, he obtained a voter registration card and driver's license, and with all four documents, obtained a passport in the name of Luis Rosa Villanueva. (*See id.* at 78-79; Gov. Ex. 3500-DT-2 at CTR 91-92.) Defendant also admitted to other uses of Villanueva's identity and his history of entering and leaving the United States. (*See* Gov. Ex. 3500-DT-2 at CTR 92-94.)

Officer Teitelbaum testified that the interview concluded at around 9:25 a.m., at which time he contacted the United State Attorney's Office, which accepted the case for prosecution. (Tr. at 80-81; Gov. Ex. 3500-DT-2 at CTR 95.) Between 9:45 a.m. and 11:45 a.m., Officer Teitelbaum prepared documents required for defendant's presentment; provided consular notification, inventoried, vouchered and sealed defendant's luggage; fed the defendant and prepared to transport defendant to the courthouse. (*See* Tr. at 81-82.)

At approximately 12:00 p.m., Officer Teitelbaum transported defendant to the courthouse, where they arrived at approximately 1:00 p.m. (*Id.* at 83.) Upon arrival, Officer Teitelbaum was advised that because defendant had stitches on his ankle, the United States Marshal Service was unable to accept defendant into custody until he was medically cleared. (*Id.* at 84.)

At approximately 1:30 p.m., defendant arrived with Officer Teitelbaum at Jamaica Medical Center in Queens, a hospital that CBP uses to treat arriving aliens. (*Id.*) Defendant was medically cleared at approximately 3:30 p.m. (*Id.* at 85-86; Gov. Ex. 26, Discharge Record.)

Given the late hour, Officer Teitelbaum's supervisor instructed that defendant be taken to Metropolitan Detention Center ("MDC") for overnight lodging. (Tr. at 87.) Defendant arrived at MDC at approximately 5:00 p.m. and was accepted into custody at approximately 5:10 p.m. (*Id.* at 88-90; Gov. Ex. 27, Intake Form.)

The next day, August 19, 2009, Officer Teitelbaum arrived at MDC at approximately 9:30 a.m. and transported defendant to the courthouse. (Tr. at 90.) They arrived at between 10:00 a.m. and 10:30 a.m. and defendant went through required processing. (*Id.* at 90-91.) Defendant was arraigned during the 2:00 p.m. session, over 40 hours after defendant

arrived at the secondary inspection area at JFK and made
statements to Officer Hernandez. (*See id.* at 91.)

## DISCUSSION

### A. Statements Made to Officer Hernandez

Defendant claims that the statements obtained by
Officer Hernandez during the secondary inspection and in the
sworn statement should be suppressed because they were obtained
in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). (*See*
Doc. No. 21, Defendant's Post-Hearing Memorandum of Law ("Def.
Mem.") at 5.) The government responds that the secondary
interview was a "routine admissibility interview" and thus is
exempt from *Miranda*'s requirements. (*See* Doc. No. 23,
Government's Post-Hearing Memorandum of Law ("Gov. Post-Hearing
Mem.") at 11.)

"Routine questioning by custom officers at border
entry points does not constitute custodial interrogation and
therefore does not implicate *Miranda*." *United States v. Miller*,
No. 08-CR-860, 2009 U.S. Dist. LEXIS 62396, at *23 (E.D.N.Y.
July 21, 2009) (citing *United States v. Silva*, 715 F.2d 43, 47
(2d Cir. 1983)); *see United States v. Moody*, 649 F.2d 124, 127
(2d Cir. 1981); *United States v. FNU LNU*, 261 F.R.D. 1, 3
(E.D.N.Y. 2009). The Second Circuit has observed that because
"border officials are charged with the responsibility of
detaining those seeking admission in order to determine their

15

admissibility[,]" they may ask "routine questions . . .
necessary to enforce immigration and customs regulations . . .
." *Silva*, 715 F.2d at 47; *see FNU LNU*, 261 F.R.D. at 3
("detaining and questioning a person seeking entry into the
United States about her identification in a secondary inspection
area does not require a *Miranda* warning.") (citing *Silva*, 715
F.2d at 46); *see also* 8 U.S.C. § 1225(b)(2)(A) (providing that
an alien "shall be detained" unless the examining officer
determines that he is "clearly and beyond a doubt entitled" to
enter the United States).

   "Only where a border crossing interrogation has as its
purpose the gathering of evidence for a future criminal
prosecution is a *Miranda* warning required." *FNU LNU*, 261 F.R.D.
at 3 (citing *Moody*, 649 F.2d at 127-28 (holding that where, upon
finding a substance described as a "caked talcum powder" on the
person of an entrant to the United States, customs agent's
question about the nature of the substance was for the purpose
of obtaining evidence for a future criminal prosecution and
*Miranda* warnings were required)). "That a defendant's responses
to questions asked as part of a border crossing inquiry may
ultimately have some evidentiary value for a future criminal
prosecution does not by itself trigger *Miranda*." *FNU LNU*, 261
F.R.D. at 3 (citing *Miller*, 2009 U.S. Dist. LEXIS 62396, at
*24).

Here, defendant claims that Officer Hernandez's questioning was "anything but routine." (Def. Mem. at 9.) In support of his contention, defendant asserts that Officer Hernandez knew that "defendant's case would be reviewed by the Criminal Enforcement Unit and that he might be criminally prosecuted." (*Id.* at 10.)

The government contends that Officer Hernandez "in no way intended to gather evidence for a criminal prosecution." (Gov. Post-Hearing Mem. at 12.) In support, the government asserts that Officer Hernandez's questions were "firmly rooted in the law of admissibility, which is administrative, not criminal." (*Id.* at 13.) The government points out that Officer Hernandez was required to ascertain "who defendant was . . . . whether the defendant was an alien or a citizen . . . and whether he had any . . . claims to citizenship." (*See id.* at 13-14.) "If the defendant had claimed citizenship, Officer Hernandez would have had to attempt to certify the claim before he could consider whether the defendant belonged in any of the '[c]lasses of aliens ineligible for visas or admission' under the [Immigration and Nationality Act]." (*Id.* at 14) (citing Tr. at 24, 40.) The government thus argues that it was proper for Officer Hernandez to inquire about defendant's ineligibility for admission under each of the INA's various grounds for inadmissibility. (*See* Gov. Post-Hearing Mem. at 14-16.)

Here, Officer Hernandez testified that the purpose of
the secondary inspection was "[t]o determine if [defendant] was
a United States citizen . . . because his claim to admissibility
was based upon being a citizen[.]" (*See* Tr. at 17-18.) Officer
Hernandez testified that he suspected that defendant might be an
"imposter" based on inconsistencies between defendant's denial
of any criminal history and data from a criminal history search.
(*See id.* at 20.) For this reason, Hernandez took and ran
defendant's fingerprints through a law enforcement database and
soon thereafter learned that they matched a 2005 arrest for an
immigration violation. (*Id.* at 20-21.) When confronted with
this information, between 10:30 p.m. and 11:00 p.m., defendant
admitted his true identity, that he had been arrested in 2005
for an immigration violation and his country of birth. (*See
id.*)

The court concludes that defendant's questioning
during the first part of his secondary inspection, before
defendant was processed for expedited removal, did not require
*Miranda* warnings. The evidence establishes that Officer
Hernandez's questioning during this first phase of defendant's
secondary inspection was directed solely toward determining
defendant's true identity for admissibility purposes. Thus,
this questioning did not require *Miranda* warnings. *See Silva*,
715 F.2d at 47; *FNU LNU*, 261 F.R.D. at 3.

Officer Hernandez testified that during the first phase of questioning, once defendant's fingerprints matched a previous immigration violation, and it was determined that defendant was not the "true bearer of the documents he presented[,]" defendant was not free to leave, withdraw his application for entry into the United States or return to the Dominican Republic. (Tr. at 39-40.) Moreover, before taking defendant's sworn statement, defendant was advised that "[u]ntil a decision is reached . . ., you will remain in the custody of the [INS]." (Gov. Ex. 7 at CTR 51.) Defendant was thus "in custody" at the conclusion of his first phase of questioning and at the time of his second phase of questioning to obtain his sworn statement because he was not free to leave. *See Miranda*, 384 U.S. at 444 (custody involves the deprivation of "freedom of action in any significant way"); *United States v. Kirsteins*, 906 F.2d 919, 923 (2d Cir. 1990) (noting that the relevant inquiry in considering whether questioning constitutes "custodial interrogation" is "whether a reasonable person in the same situation would have believed that he was not free to leave").

Once it was established that the defendant had presented false identification documents, Officer Hernandez was instructed by his supervisor at approximately 11:00 p.m. to process defendant's expedited removal from the United States and obtain a sworn statement. (Tr. at 21-22.) His supervisor

further instructed Officer Hernandez not to ask questions regarding the passport and how defendant obtained the identity, and advised Hernandez that the CEU would review the entire case. (*Id.*)  To that end, Officer Hernandez asked defendant questions concerning his alienage and admissibility in an effort to determine whether defendant had any claim to United States citizenship.  (*See id.* at 24-25, 40-41.)

After determining that defendant had no claim to United States citizenship and no grounds for admission, however, Officer Hernandez continued to ask defendant questions confirming the circumstances of his attempted entry. Specifically, Officer Hernandez asked whether defendant had attempted to enter the United States with a passport and birth certificate bearing the name Luis F. Rosa Villanueva; how long he had lived in the United States; what happened when he was arrested in 2005 for an immigration offense; where defendant lived and for how long; and where defendant was employed.  (*See* Gov. Ex. 7 at CTR 53-54.)  Officer Hernandez also asked defendant to verify his name and date and place of birth, even though defendant had previously disclosed his name and place of birth.

The court concludes that from the sequence of events, questions asked during the second phase of questioning to obtain defendant's sworn statement, in connection with defendant's

expedited removal, were largely unnecessary to determine
defendant's admissibility.  Specifically, the court questions
the necessity of inquiries directed toward defendant's identity,
especially because defendant had admitted his true identity and
place of birth during the first phase of questioning of the
secondary inspection.  Moreover, questions directed toward
defendant's past and present use of a United States passport and
his past activities in the United States were unnecessary to
determine defendant's admissibility once it was determined that
defendant was inadmissible based on his prior immigration
violation and fingerprint match and use of false identification
documents.

The Second Circuit has held that "*Miranda* warnings are
required in border interrogations when the questioning of the
official becomes an interrogation that is custodial in nature
and is one in which 'information is sought for the purpose of
using it against [a] person in a criminal proceeding.'"  *Silva*,
715 F.2d at 47-48 (quoting *Moody*, 649 F.2d at 127); *see United
States v. Tudoran*, 476 F. Supp. 2d 205, 211 (N.D.N.Y. 2007)
(*Miranda* warnings were required when questions were no longer
attempts to discern defendant's alienage).  "*Miranda* warnings
are required '[i]f the inspector's questions *objectively* cease
to have a bearing on the grounds for admissibility and instead
only further a criminal prosecution.'"  *Id.* at 211 (emphasis in

original) (quoting *United States v. Long Tong Kiam*, 432 F.3d
524, 530 (3d Cir. 2006)).

Here, with the exception of questions directed toward
defendant's claim to United States citizenship through a family
relative or a basis for asylum relief, Officer Hernandez's
questioning of defendant in connection with the sworn statement
(Gov. Ex. 7) was likely to elicit incriminating information
about defendant's falsely claimed immigration status, alleged
use of a fraudulently-obtained passport and history of residence
in the United States.  Indeed, before taking defendant's sworn
statement, Officer Hernandez knew defendant's true identity,
place of birth, that defendant had presented a United States
passport and birth certificate in the name of Luis F. Rosa
Villanueva and that defendant was not Luis Rosa Villanueva.
(*See* Tr. at 15-16, 20-21.)  Thus, it appears that the re-
questioning defendant about his identity and use of an allegedly
fraudulently-obtained passport was aimed at eliciting
incriminating information rather than simply compiling routine
information to process defendant's expedited removal.  *See*
*United States v. Pigott*, No. 93-CR-199, 1994 U.S. Dist. LEXIS
6728, at *30-31 (N.D.N.Y. May 16, 1994) (because customs
inspector suspected defendant of having presented an altered
passport, and had verified his actual identity, inspector's
"questioning of defendant about his identity was likely to

elicit (and did elicit) incriminating information about
defendant's immigration status, as well as defendant's alleged
use of a falsified passport," and could not constitutionally be
conducted absent prior *Miranda* warnings); *see also United States
v. Toribio-Toribio*, No. 09-CR-161, 2009 U.S. Dist. LEXIS 68699,
at *6-7 (N.D.N.Y. Aug. 6, 2009) (where officer "was reasonably
aware of who he was interviewing[, and] had ample reason to
believe that Defendant was falsely representing his citizenship,
. . . obtaining basic pedigree information . . . was not just
obtaining necessary background information, but was likely to
provide the primary evidence supporting any violation" of the
immigration laws, because in an immigration case, "questions
pertaining to place of birth go beyond basic pedigree
information and go to the heart of the crime itself").

By contrast, questions concerning defendant's
potential claim to United States citizenship through a family
relative (*see* Gov. Ex. 7 at CTR 52), and potential bases for
asylum relief (*see* Gov. Ex. 8), were necessary to determine
defendant's admissibility.  The court thus concludes that,
except for questions related to defendant's possible claim to
United States citizenship through a relative or asylum relief,
further custodial interrogation during the second phase of
questioning to obtain defendant's sworn statement required that

defendant first be advised of and waive his *Miranda* rights.
This requirement was not met.

Accordingly, the court grants defendant's motion to
suppress statements made to Officer Hernandez as follows.  The
government shall not offer evidence related to the following
questions and responses contained in Government Exhibit 7,
"Record of Sworn Statement in Proceedings under Section
235(b)(1) of the Act[:]"

- o What is your true and complete name?  (CTR 52)
- o Have you ever used, or been known by any other
  names?  Is so, what names have you used?  (CTR
  52)
- o Do you mean Luis A. Rosa Villanueva?  (CTR 52)
- o What is your date of birth?  (CTR 52)
- o What is your place of birth?  (CTR 52)
- o All questions and responses on page 3 of the
  Sworn Statement (CTR 53)
- o Were you working while you were living in the
  United States? (CTR 54).

(*See* Gov. Ex. 7.)

## B. Statements Made to Officer Teitelbaum

Defendant also moves to suppress his post-*Miranda*
statements to Officer Teitelbaum on two grounds.  First,
defendant asserts that "the entire system of conducting the
admissibility interviews prior to anticipated criminal
investigations seems designed to circumvent <u>Miranda</u>."  (Def.
Mem. at 12.)  That is, defendant contends that Officer
Hernandez's questioning and subsequent *Mirandized* questioning by
Officer Teitelbaum was part of a "continuous" interrogation

designed to thwart *Miranda*, and that the subsequent statement to
Officer Teitelbaum preceded by *Miranda* warnings failed to
apprise defendant of his Fifth Amendment rights to silence and
counsel. (*See id.* at 11-12.) Second, defendant asserts that
his statements to Officer Teitelbaum should be suppressed
because his presentment for arraignment was unreasonably
delayed. (*See id.* at 13.) The court will address each argument
in turn below.

As an initial matter, the court finds that defendant
knowingly and voluntarily waived his Fifth Amendment rights by
signing the *Miranda* waiver form and making a statement to
Officer Teitelbaum. (*See* Gov. Ex. 17; Tr. at 75.) Defendant
does not allege that he failed to understand the *Miranda* rights
or that his waiver of those rights was not voluntary. The
evidence establishes that Officer Teitelbaum advised defendant
of each of his rights by reading from a standard *Miranda* waiver
form. (Tr. at 75.) The warnings were translated into Spanish
by an interpreter and a Spanish language written copy of the
warnings was provided to defendant. (*Id.* at 75.) The court
credits Officer Teitelbaum's testimony that defendant indicated
that he understood his rights, and agreed to speak with
Teitelbaum. (*See id.* at 75-76.) Officer Teitelbaum's testimony
is corroborated by the fact that defendant signed and dated the
*Miranda* waiver form. (*See* Gov. Ex. 17.)

## 1. Continuous Interrogation

Defendant asserts that his statements to Officer Teitelbaum should be suppressed because Teitelbaum's questioning was "continuous" with Officer Hernandez's secondary interview. (*See* Def. Mem. at 11.)  In support of his assertion, defendant relies on *Missouri v. Seibert*, 542 U.S. 600 (2004), which holds that "midstream recitation of warnings after interrogation and unwarned confession" do not "effectively comply with *Miranda*'s constitutional requirement."  *Id.* at 604 (refusing to admit statements where pre-warning interrogation elicited a full confession that was repeated after warnings were administered in a second interview, conducted in the same place by the same officer after a short break).

The plurality in *Seibert* explained that the "threshold issue when interrogators question first and warn later is . . . whether . . . the warnings could function effectively as *Miranda* requires."  *Id.* at 611-612 (internal quotation marks omitted). To address the "threshold" issue of whether warnings delivered midstream are effective, the *Seibert* plurality set forth five factors to consider in totality:

> [1] the completeness and detail of the questions
> and answers in the first round of interrogation,
> [2] the overlapping content of the two
> statements, [3] the timing and setting of the
> first and the second, [4] the continuity of
> police personnel, and [5] the degree to which the

> interrogator's questions treated the second round
> as continuous with the first.

*Id.* at 615; *see also United States v. Carter*, 489 F.3d 528, 536
(2d Cir. 2007) (admitting post-warning statements where the
initial interview was brief and there was "almost no overlap"
between pre-warning statement and the full confession defendant
gave after he received warnings).

The *Seibert* plurality explicitly refused to rely on
the subjective intent of the questioning officer in making its
determination. *Seibert*, 542 U.S. at 616 n.6 ("Because the
intent of the officer will rarely be as candidly admitted as it
was here (even as it is likely to determine the conduct of the
interrogation), the focus is on facts apart from intent that
show the question-first tactic at work.") The *Seibert*
dissenters also refused to inquire into the intent of the
officers. *Id.* at 624 ("The plurality's rejection of an intent-
based test is also, in my view, correct. . . . Because
voluntariness is a matter of the suspect's state of mind, we
focus our analysis on the way in which suspects experience
interrogation.") (O'Connor, J., dissenting).

As to the first *Seibert* factor — the completeness of
the unwarned questioning — defendant claims that Officer
Hernandez's interrogation was "extensive[.]" (*See* Def. Mem. at
12.) The evidence establishes that Officer Hernandez questioned

defendant regarding his true identity, claims to United States citizenship, present and past use of a false passport presented upon defendant's arrival at JFK, prior arrests and deportation, and grounds for asylum relief. (*See* Gov. Ex. 7.) Officer Hernandez did not ask how defendant had obtained the passport. (*See* Tr. at 21.)

As to the second factor — the overlapping content of defendant's statements — the government contends that "the two interviews did not meaningfully overlap." (Doc. No. 14, Government's Pre-Hearing Memorandum of Law ("Gov. Pre-Hearing Mem.") at 20.) The evidence establishes that Officer Teitelbaum's questioning elicited from defendant similar overlapping admissions concerning his true identity, prior arrests and deportation, and past use of the passport to gain entry into the United States. (*See* Gov. Ex. 3500-DT-2; *see also* Tr. at 78-79.) *Cf. Miller*, 2009 U.S. Dist. LEXIS 62396, at *35 (finding that "the only overlap between the statements involved defendant's disclosure of his social security number and name . . . . There is no evidence that the CBP officers made follow-up inquiries regarding defendant's true identity, or the *bona fides* regarding his possession of the fraudulent passport and identification documents, after defendant provided his real social security number and acknowledged his name.") The primary difference between the interviews by Officer Hernandez and

Officer Teitelbaum is that Officer Teitelbaum asked defendant how he obtained the passport he presented to gain entry into the United States. (*See* Tr. at 78-79; *Compare* Gov. Ex. 7 *with* Gov. Ex. 3500-DT-2.) In response, defendant explained in detail how he obtained and previously used the passport.

The third and fourth factors are the timing and setting of the interrogations and continuity of police personnel, respectively. The interview with Officer Hernandez took place in a "small room" in the secondary inspection area. (Tr. at 23.) Officer Teitelbaum interviewed defendant approximately six hours later in the secondary inspection area, although it is unclear from the record whether the interview took place in the same or similar "small room" in the secondary area. (*See id.* at 31, 75.) Officer Hernandez was not present during Officer Teitelbaum's interview of defendant.

The last *Seibert* factor is the degree to which the interrogator's questions treated the subsequent rounds as continuous relative to the initial round of questioning. In other words, "how much [did] the interrogator look[] to the earlier statements when eliciting later statements[?]" *See United States v. Cohen*, 372 F. Supp. 2d 340, 358 (E.D.N.Y. 2005). Officer Hernandez testified that the CEU would review the case. (Tr. at 46.) Officer Teitelbaum testified that he reviewed Officer Hernandez's interview of defendant "to get a

general knowledge of the facts of what had happened previously and use it as a basis to form my questions." (*Id.* at 96.) However, when asked whether, in formulating his questions, he repeated some of Officer Hernandez's questions, Teitelbaum responded, "Not really. Officer Hernandez's questions were general administrative questions. So I really did not have to go into that since that was already covered." (*Id.*)

Although there is evidence that Officer Teitelbaum reviewed Officer Hernandez's interview notes, there is no evidence, as there was in *Seibert*, "of a coordinated . . . two-step strategy" between Officer Hernandez and Officer Teitelbaum to elicit a confession from defendant and "sidestep *Miranda* requirements." *See Miller*, 2009 U.S. Dist. LEXIS 62396, at *33. Nor is there any evidence that Officer Teitelbaum discussed with Officer Hernandez defendant's case. Instead, the evidence establishes that Officer Teitelbaum advised defendant that the interview would focus on possible criminal prosecution, as opposed to administrative violations and therefore differed from the earlier interview. (*See* Tr. at 74-75; Gov. Ex. 3500-DT-2 at CTR 89.)

The court concludes that although the undisputed facts present a close case, in totality, the *Seibert* factors support a finding that the *Miranda* warnings administered by Officer Teitelbaum effectively informed the defendant of his Fifth

Amendment rights to silence and counsel.  The evidence establishes that "a reasonable person" in defendant's position could have viewed Officer Teitelbaum's interrogation "as a new and distinct experience" and the *Miranda* warnings "could have made sense as presenting a genuine choice whether to follow up on the earlier admission."  *See Seibert*, 542 U.S. at 615 (citation omitted).  Accordingly, the court denies defendant's motion to suppress his statements to Officer Teitelbaum because the interrogation was not improperly "continuous" of Officer Hernandez's earlier interview.

### 2. Delay in Presentment

Defendant asserts that his statements to Officer Teitelbaum should be suppressed because of an unnecessary or unreasonable delay under Federal Rule of Criminal Procedure 5(a), 18 U.S.C. § 3501(c), and the *McNabb-Mallory* Rule.  (Def. Mem. at 13-14.)  The government contends that defendant's statements to Officer Teitelbaum were made within six hours of defendant's arrest and were therefore "presumptively admissible" and that, "even if defendant had confessed more than six hours after arrest, there was no unreasonable delay in questioning the defendant or presenting him for arraignment."  (Gov. Post-Hearing Mem. at 21-22.)

*McNabb v. United States*, 318 U.S. 332 (1943), and *Mallory v. United States*, 354 U.S. 449 (1957), "generally

rende[r] inadmissible confessions made during periods of detention that violat[e] the prompt presentment requirement of [Fed. R. Crim. Pro.] 5(a)" (the "*McNabb-Mallory* Rule"). *See Corley v. United States*, 129 S. Ct. 1558, 1563 (2009) (quoting *United States v. Alvarez-Sanchez*, 511 U.S. 350, 354 (1994)). Federal Rule of Criminal Procedure 5(a) states that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge . . . ." Fed. R. Crim. P. 5(a).

In response to the Supreme Court's rulings in *McNabb* and *Mallory*, Congress enacted 18 U.S.C. § 3501(c). Section 3501(c) provides, in relevant part, that

> In any criminal prosecution . . . a confession made . . . by . . . a defendant . . ., while . . . under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge . . . if such confession is found by the trial judge to have been made voluntarily and . . . within six hours immediately following his arrest or other detention . . . . *Provided*, That the [six-hour] time limitation . . . shall not apply in any case in which the delay in bringing such person before such magistrate judge . . . beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge . . . .

18 U.S.C. § 3501(c) (emphasis in original).[1]

Recently, the Supreme Court reaffirmed the applicability of the *McNabb-Mallory* rule in *Corley v. United States*. 129 S. Ct. at 1563. The Supreme Court held, however, that under § 3501(c), "a district court with a suppression claim must find whether the defendant confessed within six hours of arrest [or other detention] (unless a longer delay was 'reasonable . . . .')." *Id.* at 1571. If a "confession occur[s] before presentment and beyond six hours . . . the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Mallory* cases, and if it was, the confession is to be suppressed." *Id.* "[E]ven voluntary confessions are inadmissible if given after an unreasonable delay in presentment" exceeding six hours. *Id.* at 1563, 1567 (citing *Upshaw v. United States*, 335 U.S. 410, 413 (1948)). The *Corley* majority observed that without *McNabb-Mallory*, "federal agents would be free to question suspects for extended periods before bringing them out in the open," even though "[c]ustodial police interrogation, by its very nature, isolates and pressures the individual . . . ." *Corley*, 129 S. Ct. at 1570 (citing *Dickerson v. United States*, 530 U.S. 428, 435 (2000)).

---

[1] Pursuant to 18 U.S.C. § 3501(e), a "confession means any confession of guilt or any self incriminating statement made or given orally or in writing." 18 U.S.C. § 3501(e).

Here, defendant was detained in CBP custody as of approximately between 10:30 p.m. and 11:00 p.m., when defendant's fingerprints were matched to the 2005 immigration violation and defendant admitted to the 2005 immigration violation, his true name and country of birth, and "it was determined that he was not the true bearer of the documents he presented." (*See* Tr. at 21-22, 40.) According to Officer Hernandez, from that point forward, defendant was not free to leave CBP because defendant "was being charged with" making "a false claim to United States citizenship." (*Id.* at 39-40.) Although Officer Hernandez testified that he understood this to be an "administrative" charge which "brings about a five year bar" (*id.*), he also testified that "a false claim to U.S. citizenship . . . may result in a criminal prosecution" (*id.* at 48).[2] Defendant was then detained overnight in CBP's custody for further investigation by the CEU for possible criminal prosecution. (*See id.*)

Officer Teitelbaum's interrogation of defendant "occurred before presentment and beyond six hours" of his detention." *See Corley*, 129 S. Ct. at 1571. Further, the delay was not a result of the distance needed to travel to the nearest

---

[2] Indeed, Count Two of the Indictment charges that defendant "willfully and knowingly use[d] and attempt[ed] to use a United States passport issued and designed for the use of another[,]" in violation of 18 U.S.C. § 1544. (Doc. No. 6, Indictment.)

magistrate judge, *see* 18 U.S.C. § 3501(c), because the nearest available magistrate judge was located approximately one hour and less than twenty miles from JFK airport. (*See* Tr. at 83.) Nor does the government contend that defendant waived speedy presentment. Thus, "the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Mallory* cases, and if it was, the confession is to be suppressed." *See Corley*, 129 S. Ct. at 1571.

"The determination of whether a delay beyond the six-hour time limit is unreasonable is necessarily fact specific." *United States v. Palacio*, 735 F. Supp. 484, 487 (D. Conn. 1990) (observing that "[i]n focusing on how the time spent was used . . . courts have not deemed delay caused by the desire to investigate other crimes a reason justifying disregard of a defendant's right to a prompt presentment") (citations omitted). "Delays attributable to routine processing, transportation, [and] overnight lodging . . . have all been found by courts in the Second Circuit to be reasonable or excludable under § 3501(c) or its predecessor, the *McNabb-Mallory* rule . . . ." *United States v. Ontiveros*, 547 F. Supp. 2d 323, 339 (S.D.N.Y. 2008) (collecting cases); *see also United States v. Rubio*, 709 F.2d 146, 153 (2d Cir. 1983) (finding no error in denying a motion to suppress a statement made during a reasonable two-day weekend pre-arraignment delay where the arraignment was delayed

due to the unavailability of a magistrate judge and there was no evidence of no purposeful postponement of the arraignment or lengthy, hostile, or coercive interrogation).

The government contends that its obligation to present defendant for arraignment did not accrue until defendant was "arrested or detained *for a federal crime* . . . ." (Gov. Post-Hearing Mem. at 24 (emphasis in original) (quoting *United States v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994).) In this vein, the government points out that Officer Hernandez was not trained in criminal law or authorized to initiate criminal charges. (Gov. Pre-Hearing Mem. at 22.) The government further asserts that "Officer Teitelbaum, however, is trained in certain areas of criminal law, and his responsibilities include determining whether certain crimes have been committed." (*Id.* at 23.) The government thus contends that "defendant could not have been charged with a federal crime until Enforcement Officer Teitelbaum determined that [defendant] had committed one." (Gov. Post-Hearing Mem. at 24.)

Contrary to the government's contention, the evidence supports a finding that the delay in defendant's presentment was to determine whether he should be criminally charged. Although the court credits Officer Hernandez's testimony that he was not authorized to refer matters for criminal prosecution (*see* Tr. at 9), the evidence establishes that a principal purpose for

defendant's overnight detention at JFK was to enable CBP's CEU to interrogate defendant with respect to possible criminal prosecution (*see id.* at 75).  The evidence also establishes that defendant was detained for further investigation by the CEU based on his statements to Officer Hernandez concerning his use of a United States passport designed for the use of another, a criminal offense ultimately charged by the government.  (*See id.* at 20-21.)  Based on a review of defendant's statements to Officer Hernandez (*see id.* at 72-73, 96), Officer Teitelbaum had sufficient information to determine whether defendant should be criminally charged, specifically, for a violation of 18 U.S.C. § 1544, misuse of a passport.

Instead of presenting defendant to a magistrate judge for arraignment, Officer Teitelbaum first interrogated defendant for an approximately two hours before contacting the United States Attorney's office to accept the matter for prosecution. (*See id.* at 80-81.)  Defendant's statements to Officer Teitelbaum were presented to the government and "strengthen the criminal case" against defendant.  (*See id.* at 95.)  The Supreme Court has recognized that a law enforcement officer's desire to conduct further investigation does not constitute a reasonable basis for delay under 18 U.S.C. § 3501(c).  *See Corley*, 129 S. Ct. at 1563 ("delay for the purpose of interrogation is the epitome of 'unnecessary delay.'") (quoting *Mallory*, 354 U.S. at

455-456); *see also United States v. Perez*, 733 F.2d 1026, 1036 (2d Cir. 1984) (holding that "agents' desire to investigate other crimes is not a legitimate excuse for their failure to respect [defendant's] right to a prompt arraignment").

Accordingly, the court concludes that the delay in defendant's presentment was not reasonable, and that defendant's statements to Officer Teitelbaum on the morning of August 18, 2009 must be suppressed pursuant to 18 U.S.C. § 3501(c) and Fed. R. Crim. Pro. 5. *See* Transcript of Record at 82, *United States v. Lora-Mercedes*, No. 08-CR-468 (E.D.N.Y. Sept. 4, 2009) (Doc. No. 59) (concluding that defendant was detained overnight "because he had committed a federal crime" and "[t]he purpose of the detention or the principal purpose, if it was not the only purpose of the detention, was for the purpose of conducting further criminal investigation including questioning. I believe the delay was reasonable, arguably until 9 a.m. when [defendant] should have been . . . delivered to a United States Magistrate . . . for arraignment.").

## **CONCLUSION**

For the foregoing reasons, the court grants in part and denies in part defendant's motion to suppress. The parties shall appear for a status conference on March 10, 2010 at 11:15 a.m.

SO ORDERED.

Dated: Brooklyn, New York
      March 1, 2010

_____
            /s/
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York
